UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HEXAGON METROLOGY, INC., and
HEXAGON HOLDING, INC,

Plaintiffs,

v.

THOMAS MOON,

Defendant.

CA 08 268 ML

C.A. No.

**PLAINTIFFS HEXAGON METROLOGY, INC. AND HEXAGON HOLDING, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, Plaintiffs Hexagon Metrology, Inc. and Hexagon Holding, Inc. (hereinafter together referred to as "Hexagon") move this Honorable Court for a Temporary Restraining Order and a Preliminary Injunction. Defendant Thomas Moon ("Moon") has accepted employment with a direct competitor, Automated Precision, Inc. ("API"), in direct violation of his non-competition, non-solicitation, and confidentiality agreement with Hexagon. While employed with Hexagon, Moon served as District Sales Manager and worked with Hexagon's most confidential information and trade secrets. Moon's employment with API has, and inevitably will, result in the misappropriation and misuse of Hexagon's confidential and proprietary information. Indeed, Hexagon discovered that Moon copied his entire Hexagon-issued laptop computer hard drive to a 500GB external storage device, which he has not returned to Hexagon, and thousands of Hexagon's confidential and trade secret files have been stored on his home computer.

The wrongful acts of Defendant have been calculated and designed to undercut and irreparably harm Hexagon's competitive position and customer goodwill. Accordingly, Hexagon has no option but to seek injunctive relief from this Court in an effort to protect its contractual interests, its confidential and proprietary business information, and trade secrets, as well as its customer relationships and goodwill. Because Hexagon has no adequate remedy at law for its injuries, which will continue to be aggravated in the future unless Defendant Moon is restrained, and pursuant to the argument and law provided in Hexagon's Brief in Support filed herewith, Hexagon is entitled to a temporary restraining order and preliminary injunction to prevent further harm.

Respectfully submitted,

By:______________________________

Todd M. Reed (#6602)
Robert J. Durant (#4279)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)
E-mail: treed@eapdlaw.com
rdurant@eapdlaw.com

Co-Counsel

BUTZEL LONG
James J. Giszczak (MI P46917)
Bernard J. Fuhs (MI P69621)
150 West Jefferson, Suite 100
Detroit, Michigan 48226
(313) 225-7000
E-mail: giszczak@butzel.com
fuhs@butzel.com
*Pro Hac Vice Admission Pending*
Attorneys for Plaintiffs

Dated: July 18, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HEXAGON METROLOGY, INC., and
HEXAGON HOLDING, INC,

Plaintiffs,

CA 08 268 ML

C.A. No.

v.

THOMAS MOON,

Defendant.

**PLAINTIFFS HEXAGON METROLOGY, INC. AND HEXAGON HOLDING, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Plaintiffs Hexagon Metrology, Inc. and Hexagon Holding, Inc. (hereinafter together referred to as "Hexagon") is a world-leading supplier of metrology systems with operations that encompass hand tools, fixed and portable coordinate measuring machines, GPS systems, level meters, laser meters, laser trackers, laser interferometers, total stations, sensors for airborne measurement, aftermarket services and software systems for one, two or three-dimensional measurements. Hexagon employed Defendant Thomas Moon ("Moon") as its District Sales Manager. In that position, Moon was responsible for selling laser tracker systems, coordinate measuring machines (CMMs), PC-DMIS software, portable arms, and vision systems, among other things. With that, his duties and responsibilities included meeting directly with customers and potential customers to learn of their requirements for laser trackers and other products, reporting to Hexagon customer feedback concerning products, coordinating training, and helping to devise strategies for promoting and selling products. Moon had extensive involvement with such customers as Vought Aircraft,

Lockheed Martin and Bell Helicopter. Because of his access to Hexagon's confidential information, trade secrets, customers, and prospects, Moon executed an employment agreement, which prohibited him from a number of activities related to Hexagon's employees and customers and work with a competitor.

Hexagon has recently discovered that since Moon's departure from Hexagon, he is working for a direct competitor, Automated Precision, Inc. ("API"), performing the same services, serving the same market area, and serving the same customers that he worked with while employed by Hexagon - all in direct violation of his Agreement. Moreover, Hexagon discovered that Moon copied his entire Hexagon-issued laptop computer hard drive to a 500GB external storage device, which he has not returned to Hexagon, and thousands of Hexagon's confidential and trade secret files have been stored on his home computer.

During Moon's employment with API, he has, and will inevitably continue to, misappropriate and misuse Hexagon's confidential information and trade secrets. Therefore, Hexagon requests that this Court enter a temporary restraining order and preliminary injunction against Moon to prohibit his unlawful conduct and to protect Hexagon from suffering further irreparable harm.

## II. STATEMENT OF FACTS

### A. The Business of Hexagon

Hexagon is a world-leading supplier of metrology systems. Its operations encompass hand tools, fixed and portable coordinate measuring machines, GPS systems, level meters, laser meters, laser trackers, laser interferometers, total stations, sensors for airborne measurement, aftermarket services and software systems for one, two or three-dimensional measurements. (Verified Complaint ("Compl."), ¶ 7; *See* **Ex. A**, Hexagon Website.)

**B. Defendant Moon's Employment at Hexagon**

Defendant Moon was hired by Leica Geosystems around 2004 as an account executive. He was employed by Leica Geosystems when it was purchased by Hexagon in 2006. Thereafter, Moon became an employee of Hexagon until his resignation, effective July 2, 2008. At the time of his resignation, Moon held the position of District Sales Manager for Hexagon. Prior to his employment with Leica Geosystems and Hexagon, Moon had no experience in the metrology industry. (Compl., ¶ 8.) In his positions with both Leica Geosystems and, later, Hexagon, Moon was responsible for selling laser tracker systems, coordinate measuring machines (CMMs), PC-DMIS software, portable arms, and vision systems, among other things. With that, his duties and responsibilities included meeting directly with customers and potential customers to learn of their requirements for laser trackers and other products, reporting to Hexagon customer feedback concerning products, coordinating training, and helping to devise strategies for promoting and selling products. Moon had extensive involvement with Hexagon customers, including, but not limited to, Vought Aircraft, Lockheed Martin and Bell Helicopter. The geographic area that Moon was responsible for included Texas and Oklahoma. (Compl., ¶ 9.)

As part of his employment, Moon signed an Agreement containing non-compete, non-solicit, and non-disclosure clauses referred to *infra*, accepting those terms as the terms of his employment with the Rhode Island based Hexagon. Moon regularly accessed and utilized, and ultimately misappropriated, Hexagon's confidential information and databases housed on Hexagon's computer servers, which are located in Rhode Island. Further, in early 2007, Moon traveled to and attended an open house in Rhode Island for Hexagon customers in the course of his job duties. He also regularly contacted and dealt with Hexagon personnel located in Rhode Island in the course of his job duties. (Compl., ¶ 10.)

On March 22, 2006, Moon executed an Employee Invention, Non-Competition, and Confidentiality Agreement with Hexagon ("Agreement"). A copy of the standard Agreement is attached as **Exhibit B** and incorporated herein by reference. Pursuant to the Agreement, Moon agreed as follows:

> 4. **Confidentiality**. I acknowledge that all Confidential Information is and shall at all times remain the property of the Company. I agree that, except as required in my duties to the Company, I will never directly, indirectly, or otherwise use, disseminate, disclose, lecture upon, or publish articles concerning Confidential Information without having first obtained written permission from the Company to do so. I will safeguard and maintain on Company premises, to the extent possible in the performance of my work for the Company, all documents and things that contain or embody Confidential Information.
>
> ***
>
> 7. **Nonsolicitation**. Independent of any obligations I might have under §9, I agree that I will not, during my employment and for a period of 90 days after my voluntary termination of employment with the Company, directly or indirectly, (a) divert or attempt to divert any person, concern, or entity which is furnished services by the Company from doing business with the Company or otherwise to change its relationship with the Company; or (b) induce or attempt to induce any customer or supplier of the Company to cease being a customer or supplier of the Company or otherwise to change its relationship with the Company.
>
> 8. **Solicitation of Company Employees**. I agree that, during my employment with the Company and for a period of one (1) year following termination of my employment with the Company, whether terminated with or without cause, I shall not directly or indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever.
>
> 9. **Restrictions on Competition**. Independent of any obligations that I might have under §7, I agree that I will not, for a period of 90 days after my voluntary termination of employment with the Company, render services directly or indirectly, whether as principal or as agent, officer, director, employee, consultant, shareholder, or otherwise, alone or in association with any other person, corporation, or entity, to or for any Conflicting Organization within the United States. I may, however, accept employment in such territory with a Conflicting Organization whose business is diversified, and which as to the part of the business in which I am engaged is not a Conflicting Organization, provided that the Company, prior to my accepting such employment shall receive separate written assurances satisfactory to the Company from such Conflicting Organization and from me, that I will not render services, directly or indirectly, in connection with any Conflicting Product. I recognize that the Company conducts or intends to conduct business within the geographic area set

forth herein, and therefore, I agree that this restriction is reasonable and necessary to protect the Company's business.

***

15. **Remedy**. Any breach or violation by me of the Agreement, including but not limited to §7 and §9, will result in immediate and irreparable injury to the Company in amounts difficult to ascertain. Therefore, should I breach any portion of this Agreement, I agree that the Company shall be entitled to proceed directly to court to obtain the remedies of specific performance and injunctive relief (including but not limited to temporary restraining orders, preliminary injunctions, and permanent injunctions) without the necessity of posting a bond or other undertakings therewith. [**Exhibit B**, ¶¶ 4, 7-9, 15.]

Additionally, the Agreement has a Rhode Island choice of law provision. *Id.* at ¶ 12.

During the course of his employment with Hexagon, Moon had access to and utilized on a regular basis Hexagon's most confidential and proprietary information and trade secrets, including, but not limited to, Hexagon's ACT customer database, processes, research and development, products and services under development, markets and selling strategies, servicing, customer lists, customer requirements, business methods or practices, training and training programs, pricing and pricing strategies, customer information, customer pricing, margin information, and the methodology for improving accuracy statements of laser trackers. (Compl. ¶ 14.) A sample of Hexagon's confidential and proprietary information and trade secrets that Defendant Moon had access to and utilized during his employ is attached as **Exhibit C.**[1]

Moon also acquired intimate knowledge concerning Hexagon's customers' service needs and preferences, customer pricing and contractual details, prospective customer information, and employee information. With that, Moon was responsible for servicing Hexagon's customers, maintaining and cultivating those customer relationships, and developing business. (Compl. ¶ 16.)

---

[1] **Exhibit C** contains a redacted sample of Hexagon's trade secrets to protect this information's confidentiality. An unredacted sample will be made available for the Court to conduct an *in camera* review upon request.

The information to which Defendant Moon was exposed is of great value not only to Hexagon, but also to its competitors who do not possess or have access to this information. The information derives independent economic value and is not generally known to or readily ascertainable by proper means by other persons or companies. (Compl. ¶ 17.) For this reason, Hexagon takes reasonable steps to ensure that its information stays confidential. Such measures include the use of non-compete, non-solicit, and confidentiality agreements, password protection, restricted building and facility access, and access to information on a need-to-know basis. (Compl., ¶ 18.)

C. **Defendant Moon's Resignation from Hexagon and Employment with API**

Moon voluntarily resigned from his employment at Hexagon effective July 2, 2008. (Compl., ¶ 19.) Around that time, Moon indicated that he was going to work for a company called Automated Precision, Inc. ("API") – a direct competitor of Hexagon - as its General Business Manager for its Metrology Product Division where he would be responsible for managing and motivating API's entire North, Central, and South Americas direct and indirect sales forces to promote the sales of API's metrology products. API develops and produces metrology products, including, but not limited to, laser trackers and laser interferometers. (Compl., ¶ 20; *See* **Exhibit D**, API Website.)

On July 8, 2008, Collin Webb sent Moon a letter reminding him of his non-compete, non-solicit, and non-disclosure obligations under his Agreement with Hexagon. (Compl., ¶ 21; *See* **Exhibit E**, 7/8/08 Moon Letter.) Moon has since refused to abide by his non-compete obligations and is working for API. (Compl., ¶ 22.)

Upon information and belief, Moon is performing the same services, serving the same market area, and serving the same customers that he worked with while at Hexagon for a direct

competitor – API. (Compl., ¶ 23.) Moon has wrongfully used, and will inevitably continue to use, Hexagon's confidential information and trade secrets that he learned during his employment with Hexagon. Further, he is working for a direct competitor of Hexagon - all in knowing violation of his Agreement. (Compl., ¶ 24.) Indeed, between June 22, 2008 and June 23, 2008 (less than two weeks before Moon's last day at Hexagon), Moon copied his entire Hexagon-issued laptop computer hard drive to a 500GB external storage device. Moreover, thousands of Hexagon's confidential and trade secret files have been stored on Moon's home computer. Many of these files, both on the 500GB storage device and the home computer, contain Hexagon's most confidential, proprietary, and trade secret information. (Compl., ¶ 25.) A sample of the documents that Moon stole is attached as **Exhibit C** to this Complaint.

Furthermore, in an apparent attempt to conceal his surreptitious activity, Moon deleted thousands of files from his Hexagon-issued laptop in the last two days of his employment with Hexagon. Additionally, he failed to return the 500GB external storage device that he used to copy his entire Hexagon-issued laptop computer, along with five to ten other external storage devices that he attached to his Hexagon-issued laptop that may also contain Hexagons' confidential information and trade secrets. (Compl., ¶ 26.)

The confidential information and trade secrets to which Moon had access will directly aid his employment with a direct competitor, including API. (Compl., ¶ 27.)

## D. <u>The Irreparable Harm Suffered by Hexagon</u>

As a direct consequence of Moon's actions, Hexagon stands to lose its employees, clients and customers, confidential, proprietary and trade secret information, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained. (Compl., ¶ 28.) Hexagon is also faced with the substantial risk that Moon will unlawfully use

Hexagon's customer, prospect, and employee information and trade secrets to Hexagon's competitive disadvantage. As a result of Moon's actions, Hexagon has suffered and will continue to suffer irreparable harm. (Compl., ¶ 29.)

If Moon is not immediately barred from violating his Agreement, from using Hexagon's confidential, proprietary, and trade secret information to solicit customers and employees of Hexagon, and from otherwise participating in activities that violate the non-competition, non-solicitation, and non-disclosure provisions of his Agreement with Hexagon, Hexagon will continue to suffer irreparable harm. (Compl., ¶ 30.) Hexagon lacks an adequate remedy at law to address the substantial and irreparable harm it is suffering as the result of Moon's actions. (Compl., ¶ 31.)

## III. ARGUMENT:

### THIS COURT SHOULD GRANT A PRELIMINARY INJUNCTION RESTRAINING AND ENJOINING DEFENDANT MOON'S UNLAWFUL CONDUCT

The purpose of a preliminary injunction is to protect the status quo pending final determination of the lawsuit. *University of Texas v. Camenisch*, 451 U.S. 390 (1981). In order to be entitled to temporary and preliminary injunctive relief in the First Circuit, a party must meet a four-part test. *Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 15 (1st Cir. 1996). Under this framework, the party seeking injunctive relief must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm absent injunctive relief; (3) that the hardship it will suffer if injunctive relief is denied outweighs the hardship imposed upon the non-movant by the injunction; and (4) that the injunction will not adversely affect the public interest. *Id.*

Each of these factors weighs strongly in favor of immediate injunctive relief. Unless immediately restrained by this Court, Defendant Moon will continue to carry out his wrongful acts and continue to cause Hexagon irreparable harm and injury. Accordingly, Hexagon respectfully

requests that this Court issue a Temporary Restraining Order, and then issue a Preliminary Injunction, enjoining Defendant from continuing his unlawful conduct.

## A. Hexagon Will Prevail on the Merits.

### 1. Moon Has Breached His Enforceable Agreement with Hexagon

Hexagon is likely to succeed on the merits of its action against Moon for breach of his Agreement because: (1) Moon is currently employed by API, a direct competitor of Hexagon, in the same market area; (2) Moon copied Hexagon-related files onto various external storage devices, which he has kept, and his home computer; and (3) consequently, Moon has misappropriated and is misusing Hexagon's confidential information and trade secrets.

To prove a breach of contract claim, Hexagon must show: (1) the existence of a contract, (2) breach of the contract, and (3) damages as result of the breach. *Mann v. Chase Manhattan Mortgage Corp.,* No. Civ.A. 00-192-T, 2002 WL 32157516 at *4 (D.R.I. March 7, 2002); *see Rendine v. Catoia,* 158 A. 712, 713 (R.I. 1932). A covenant not to compete that is ancillary to the sale of a business or an employment agreement is enforceable under Rhode Island law as long as it is reasonable, not overly broad in scope, and protects legitimate interests. *See In re Givens*, 251 B.R. 11, 14 (Bankr. R.I. 2000); *Koppers Prods. Co. v. Readio*, 197 A. 441, 444-45 (R.I. 1938).

As discussed below, even if Moon had a change of heart and intended to move forward with the utmost good faith, Moon cannot prevent, absent appropriate injunctive relief, his knowledge of Hexagon's confidential information from showing up in his work. *See Lowry Computer Products, Inc. v. Head,* 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) (If defendant "is working for a direct competitor in a similar area, their knowledge is bound to have a significant impact on Lowry's business.") Once this information has been divulged, it cannot be retrieved. This is particularly true here because Moon was entrusted with Hexagon's most sensitive information. Because Moon

can successfully satisfy these four factors, this Court should grant Hexagon's Motion for Temporary Restraining Order and Preliminary Injunction.

**a. The Agreement Protects Hexagon's Legitimate Business Interests**

The fact that Moon's Agreement protects Hexagon's legitimate business interests cannot be disputed. Employers have legitimate business interests, for example, in protecting its customer goodwill, protecting a former employee's use of any special training or skills provided by the employer, protecting against the use of its trade secrets, *Dial Media v. Schiff*, 612 F. Supp. 1483, 1489 (D.R.I. 1985), and in protecting other confidential and proprietary information, such as customer lists, profit margins, corporate strategies, and pricing schemes. *Paramount Office Supply v. MacIsaac Inc.*, 524 A.2d 1099, 1101 (R.I. 1987); *Rego Displays v. Fournier*, 119 R.I. 469, 379 A.2d 1098, 1101 (1977); *see also Lowry*, 984 F. Supp. at 1116; *Superior Consultant Co., Inc. v. Walling*, 851 F. Supp. 839, 847-48 (E.D. Mich. 1994). Because Moon had access to and utilized on a regular basis Hexagon's most confidential information and was granted extensive customer contact, there is no dispute that Hexagon has the requisite protectable interests.

**b. The Restrictions in the Agreement are Reasonably Tailored to Protect Hexagon**

As for reasonableness, in this case, the non-competition and non-solicitation obligations could not be narrower. Moon is restricted from competing with Hexagon, and from soliciting Hexagon customers, for a period of 90 days from the termination of his employment and from soliciting Hexagon employees for one year from the termination of his employment. But given Moon's massive theft of Hexagon's confidential information and trade secrets, Hexagon is requesting that Moon be prohibited from competing with Hexagon and soliciting its customers for at least one year. With that, Moon is only prohibited from competing with Hexagon in the metrology industry. This prohibition is restricted to a narrow and focused industry. Moreover,

Hexagon is only asking that he be prohibited from working in the market area in which he worked and had responsibility, Oklahoma and Texas, and from doing business with Hexagon customers. Moon, therefore, has many opportunities to work for other companies in areas outside the restricted market area and with different customers or in a plethora of other industries. He is not unduly restricted from gaining a livelihood by the Agreement.

With respect to time limitation, one year is reasonable. Courts have consistently held that covenants with one-year durations are reasonable and enforceable. Indeed, far longer periods of time have been upheld. *See, e.g., In re Givens*, 251 B.R. 11, 16 (Bankr. R.I. 2000) (finding worldwide, 6-year non-compete reasonable in sale-of-business context); *Lowry*, 984 F. Supp. at 1116 (finding one-year reasonable and emphasizing that "as to duration, courts have upheld time periods of six months to *three years*."); *Bristol Window & Door, Inc. v. Hoogenstyn,* 250 Mich. App. 478; 650 N.W.2d 670 (2002) (enforcing a three-year, statewide non-competition agreement executed by an independent sales representative). Therefore, the one year duration is more than reasonable and necessary to protect Hexagon's customer goodwill, competitive edge, and confidential and trade secret information.

**c. Moon Has Blatantly Violated his Reasonable Agreement.**

There is no dispute that Moon violated his Agreement with Hexagon. Moon agreed that for 90 days after leaving Hexagon's employment, he would not compete against Hexagon or associate himself with any Hexagon competitor. Hexagon has recently discovered that Moon is working for API, a direct competitor, performing the same services and serving the same market area that he was responsible for as a Hexagon employee. His new employment is a clear breach of his Agreement with Hexagon.

Furthermore, Moon agreed that he would never use or disclose any confidential business information or trade secrets belonging to Hexagon or Hexagon's customers. Despite these

contractual obligations, Moon is using Hexagon's confidential information and trade secrets to compete with Hexagon and undermine Hexagon's customer goodwill and competitive edge. Indeed, Moon copied his entire Hexagon-issued laptop computer hard drive to a 500GB external storage device, thousands of Hexagon's confidential and trade secret files have been stored on Moon's home computer, and Moon has failed to return the 500GB storage device along with five to ten other storage devices that where attached to his Hexagon-issued laptop. As a result of his actions, Moon has breached, and is continuing to breach, his Agreement with Hexagon.

**2. Defendant Moon Has Violated the Rhode Island Uniform Trade Secrets Act.**

Defendant's use and disclosure of Hexagon's confidential information is also enjoinable under the Rhode Island Uniform Trade Secrets Act (RIUTSA), R.I. Gen. Laws § 6-41-1, *et seq.* R.I. Gen. Laws § 6-41-2 (a) provides:

> Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

It is unquestionable that the information Defendant Moon has misappropriated, and will continue to misappropriate, constitutes trade secrets under RIUTSA. Under RIUTSA, a two-prong analysis is employed to determine whether information constitutes a protectable trade secret:

> (1) Does the information derive independent economic value from not being generally known to others; and
>
> (2) Did the employer take reasonable steps to protect the confidentiality of the information. [R.I. Gen. Laws § 6-41-1(D)].

Any argument by Defendant that the information that was misappropriated is public knowledge is simply incorrect. Information concerning Hexagon's pricing, services, and customers constitutes intimate knowledge, attainable only because of Moon's employment with Hexagon. *See*

*Morlife v. Perry*, 56 Cal. App. 4th 1514, 1521; 66 Cal. Rptr. 2d 731 (1997) ("[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market.").

Courts will order injunctive relief even when no actual misappropriation has occurred, but misappropriation is threatened. This general rule is consistent with numerous decisions from other courts enjoining threatened disclosure pursuant to the Uniform Trade Secrets Act. *See, e.g., Pepsico Inc v. Redmond*, 54 F.3d 1262 (7th Cir. 1995) (applying Illinois law); *La Calhene, Inc v. Spolyar*, 938 F. Supp 523 (W.D. Wis. 1996) (applying Wisconsin law and enjoining defendant from using plaintiff's confidential information, such as strategic and marketing plans and technical specifications, which constituted trade secrets); *Uncle B's Bakery, Inc v. O'Rourke*, 920 F. Supp. 1405 (N.D. Iowa 1996) (applying Iowa law and finding irreparable harm in light of the economic value derived from plaintiff's confidential information and defendant's employment with a competitor).

In *PepsiCo, Inc. v. Redmond*, the Court was faced with a similar factual scenario and applied Illinois' version of the RIUTSA. Redmond worked for PepsiCo as a general manager, which gave him access to inside information and trade secrets, such as strategic plans, marketing, distribution information, marketing plans, growth expectations, operational changes, and financial goals. As part of his employment, Redmond signed a confidentiality agreement with PepsiCo. It is critical to note that Redmond did not sign a non-compete agreement. Redmond subsequently resigned his employment with PepsiCo and accepted employment with Gatorade. At the outset, the Seventh Circuit pointed out that the Illinois Trade Secret Act provided that a court may enjoin the "actual or threatened misappropriation" of a trade secret. The Court further stated that "PepsiCo finds itself in the position of a coach, one of whose players have left, playbook in hand, to join the opposing team

before the big game." *Id.* at 1270. Thus, when the Court of Appeals coupled the demonstrated inevitability that Redmond would rely on PepsiCo's trade secrets, with the district court's reluctance to believe that Redmond would refrain from disclosing these secrets in his new position, the Court of Appeals concluded that the district court correctly decided that PepsiCo demonstrated a likelihood of success in its statutory claim of trade secret misappropriation. *Id.* at 1271.

Similar to the facts in *Redmond*, there already is evidence of Defendant Moon's actual misappropriation of Hexagon's trade secrets. While still employed by Hexagon, Moon copied his entire Hexagon-issued laptop computer hard drive to a 500GB external storage device, thousands of Hexagon's confidential and trade secret files have been stored on Moon's home computer, and he has failed to return the 500GB storage device along with five to ten other storage devices that where attached to his Hexagon-issued laptop

Moon was among a select few placed in positions of trust and confidence with regard to Hexagon's confidential information and trade secrets. Hexagon's confidential information and trade secrets have been established at considerable time and expense to Hexagon and are not generally known. Hexagon's confidential information and trade secrets are of immense value to anyone operating in a similar business as Hexagon. Hexagon diligently protects its confidential information and trade secrets. As a matter of policy, access to such information is provided on a need-to-know basis, and it uses technical security measures (such as passwords) and physical security measures to implement its policies. Further, Hexagon has employment agreements with non-compete, non-solicit, and confidentiality provisions with all of its employees. Hexagon created the information and property that Defendant has in his possession over many years and at a great cost. In fact, Moon has the ability to use Hexagon's trade secrets and Hexagon's customer contacts, underbid Hexagon, and take its business – which is exactly what Moon is doing

Moon's continued use and disclosure of Hexagon's proprietary and confidential information for API's advantage is inevitable, and has already occurred. Moon has fiduciary obligations not to disclose this information and not to wrongfully use this information for his own competitive advantage. Moon's possession and inevitable use of Hexagon's trade secrets has allowed Moon and API to step into the shoes of Hexagon, without having to spend money and do the work performed by Hexagon to develop the information and property. Accordingly, Moon's use of Hexagon's confidential information is also enjoinable under RIUTSA, and all claims contained in the Verified Complaint will result in success on the merits.

**B. <u>If Preliminary Injunctive Relief Is Not Granted, Hexagon Will Suffer Irreparable Injury.</u>**

Hexagon will suffer irreparable harm if a preliminary injunction is not granted. In *Superior v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994), the court stated that "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses are difficult to calculate." *Id.* at 847; *See also Barilla America, Inc v. Wright,* 2002 U.S. Dist. LEXIS 12773 (July 5, 2002) (disclosure of trade secrets such as a company's most closely-guarded financial and technical information is the type of disclosure that would irreparably harm a company). (A copy of the *Barilla* decision is attached as **Ex. F**). Furthermore, the court in *Lowry* held that the disclosure of confidential, proprietary information by a former employee constituted irreparable harm to his former employer. 984 F. Supp. at 1116 (Defendant's "knowledge is <u>bound</u> to have significant adverse impact on Lowry's business").

Unless enjoined by this Court, Defendant Moon will continue to use Hexagon's confidential information and trade secrets in violation of his contractual, statutory and fiduciary duties to Hexagon. As described above, Moon acquired detailed confidential and information and trade secrets of Hexagon. His disclosure of this information, and threatened future disclosure, will

continue to inflict irreparable harm on Hexagon. The courts have recognized that it would be totally unreasonable to expect Moon to work in a similar position for a direct competitor and ignore his intimate knowledge of Hexagon's confidential information and trade secrets.

Hexagon has no adequate remedy at law for Moon's misconduct because the injuries that Hexagon has suffered, and will continue to suffer, in connection with the loss of its business and customer goodwill are so indefinite and speculative as to be incapable of exact proof. *See Chem-Trend*, 780 F. Supp. 463 (E.D. Mich. 1991) (finding that "it would not be possible to measure plaintiff's actual loss of customers and goodwill").

### C. <u>The Harm to Hexagon If a Preliminary Injunction Is Denied Outweighs the Harm to Defendant If It Is Granted</u>

The injunction requested by Hexagon only prohibits Moon from working for a competitor, such as API, in any market area that he worked or had responsibility for while employed by Hexagon, from soliciting Hexagon customers and employees, from using Hexagon's confidential information and trade secrets, and from avoiding his contractual, statutory, and fiduciary obligations. It merely prevents Moon from committing wrongful acts that interfere with Hexagon's contractual and property rights. Moon is free to seek employment that does not violate his obligations or involve the use or disclosure of Hexagon's trade secrets and confidential information. Therefore, there can be no harm to Moon.

On the other hand, Hexagon faces irreparable harm if an injunction is not granted. The loss to Hexagon of customer goodwill or any confidential information is incalculable. Defendant Moon and API have stepped into the shoes of Hexagon and are using Hexagon's trade secrets and confidential information for their own benefit. The harm to Hexagon should this Court deny a preliminary injunction far outweighs the harm to Moon should it be granted.

**D. The Public Interest Supports the Issuance of a Preliminary Injunction**

The public interest in protecting confidential information and enforcing valid employment contracts justifies preliminary injunctive relief. If the courts do not enjoin parties to such agreements from violating them and from misappropriating trade secrets, then the statute becomes a dead letter.

The public also has an interest in proper adjudication of disputes. The purpose of a temporary restraining order or preliminary injunction is not to achieve a final and formal determination of the parties' rights, but merely to maintain the status quo and prevent acts causing irreparable injury to the parties. *See Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521 (R.I. 1997). In this case, the status quo to be preserved is the status that preceded Defendant's misappropriation of Hexagon's confidential information and trade secrets and Moon's breach of contract. A preliminary injunction would simply insure that no further injury will result to Hexagon pending a final hearing on the merits. Thus, the public interest supports not only the enforcement of a reasonable agreement, but also the enjoining of violations of such agreement prior to a trial.

**E. This Court Should Allow Expedited Discovery**

Given the inevitable irreparable harm that could result to Hexagon and the need for immediate relief, expedited discovery will afford the parties an opportunity to engage in the necessary additional fact-finding prior to the Court's preliminary injunction hearing. Moreover, it will disclose what additional parties, if any, should be added to this case. In this way, the Court will be allowed to decide this dispute upon a presentation of all relevant facts.

## IV. CONCLUSION

Based on the foregoing, Hexagon requests that this Court grant the relief requested in the Verified Complaint, and enter a Temporary Restraining Order and then a Preliminary Injunction.

Respectfully submitted,

By:____________________________

Todd M. Reed (#6602)
Robert J. Durant (#4792)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 (Fax)
E-mail: treed@eapdlaw.com
rdurant@eapdlaw.com

Co-Counsel

BUTZEL LONG
James J. Giszczak (MI P46917)
Bernard J. Fuhs (MI P69621)
150 West Jefferson, Suite 100
Detroit, Michigan 48226
(313) 225-7000
E-mail: giszczak@butzel.com
fuhs@butzel.com
*Pro Hac Vice Admission Pending*
Attorneys for Plaintiffs

Dated: July 18, 2008