# EXHIBIT F

LEXSEE 2002 U.S. DIST. LEXIS 12773

**BARILLA AMERICA, INC., an Illinois corporation, Plaintiff, v. JERRY WRIGHT and AMERICAN ITALIAN PASTA COMPANY, a Delaware corporation, Defendants.**

**4-02-CV-90267**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA, CENTRAL DIVISION**

*2002 U.S. Dist. LEXIS 12773*

**July 5, 2002, Decided**

**DISPOSITION:** [*1] Preliminary injunction granted and bond required.

**COUNSEL:** For BARILLA AMERICA INC, plaintiff: GEORGE A LAMARCA, JUSTIN E LAVAN, LAMARCA & LANDRY, WEST DES MOINES, IA.

For BARILLA AMERICA INC, plaintiff: IRVING M GESLEWITZ, ANTHONY C VALIULIS, MUCH SHELIST FREED DENEBERG ARMENT & RUBENSTEIN PC, CHICAGO, IL.

For JERRY WRIGHT, AMERICAN ITALIAN PASTA COMPANY, defendants: STANLEY E CRAVEN, BRYAN T WHITE, SPENCER FANE BRITT & BROWNE LLP, OVERLAND PARK, KS.

For JERRY WRIGHT, AMERICAN ITALIAN PASTA COMPANY, defendants: JEFFREY D HANSLICK, BLACKWELL SANDERS PEPER MARTIN LLP, KANSAS CITY, MO.

**JUDGES:** ROBERT W. PRATT, U.S. DISTRICT JUDGE.

**OPINION BY:** ROBERT W. PRATT

**OPINION**

MEMORANDUM OPINION AND ORDER

The Court has before it Plaintiff's Motion for Preliminary Injunction and Request for Expedited Hearing. On June 5, 2002, the Court entered a temporary restraining order, which it then amended on June 6, 2002. The Court then extended that order for an additional ten days on June 17 in order to complete the evidentiary hearing, which began on June 14 but had to be continued, on June 24, 2002. The evidentiary hearing was completed on June 24. However, the Court again extended the temporary [*2] restraining order in order to give this decision the time and effort it was due. For the following reasons, the Court will now issue a preliminary injunction.

**I. BACKGROUND**

Plaintiff Barilla America, Inc. ("Barilla") is a pasta manufacturing company. Defendant American Italian Pasta Company ("AIPC") is also a pasta manufacturing company. Defendant Jerry Wright was the plant manager at Barilla's production facility in Ames, Iowa from January 10, 2002 to May 24, 2002, at which time he left Barilla to become plant manager at the new AIPC production facility in Tolleson, Arizona.

Barilla's parent company started as a bread and pasta company in Parma, Italy in 1877. Currently, the parent company is the world's leading producer of pasta with production sites in twenty-five locations worldwide. Barilla entered the U.S. market in 1995 by selling pasta through the food service channel. Growing U.S. sales prompted Barilla to build a manufacturing facility in Ames, which became fully operational by 1999. The $ 130,000,000 production plant was outfitted with three pasta lines that were built to exact Barilla specifications. Since its entry into the U.S. market Barilla has become the number [*3] one selling national pasta retail brand, eclipsing its two closest competitors, AIPC and New World Pasta. In order to maintain high quality standards, Barilla uses the same specifications, processing approach, and quality controls at all of its production facilities. The processes involved have been tested and developed throughout the company's 125 year history. Barilla maintains that consistent improvements have allowed it

to be positioned as a market leader in quality while other brands compete primarily on price.

Wright's former employer, Borden Foods Corporation ("Borden"), sold its St. Louis manufacturing facility where he was working to New World Pasta in October 2001. Wright then lost his job with Borden and began a job search through various internet resources and head hunters. Austin Packaging offered Wright a plant manager position at its Minnesota facility, which he provisionally accepted. Within a few days of accepting the Austin offer, a head hunter contacted Jerry concerning the Barilla position. Barilla was experiencing a sensitive situation at its Ames plant and needed to hire a new plant manager. The current plant manager was stepping down because of low employee **[*4]** morale after a failed unionization attempt. William McGowan, Vice President of Supply Chain and Distribution at Barilla, interviewed Wright for the plant manager position at the Ames facility and later presented Wright with an offer letter dated January 8, 2002. There was no discussion concerning a confidentiality and non-compete agreement at the time, nor did the offer letter reference or enclose such an agreement. Wright accepted Barilla's offer and rescinded his acceptance of the Austin Packaging job.

Upon his acceptance, Barbara Maiorca, Barilla's Human Resources Manager, mailed a new hire orientation packet to Wright via FedEx. The packet contained Barilla policies and procedures, a confidentiality and non-compete agreement, the employee handbook, benefits overview and related forms, federal and state tax forms, healthcare plan summaries, training details, as well as other information. Maiorca notified and later reminded Wright that there were forms in the packet he would have to sign and return to the company.

Shortly after Wright began working at the Ames facility, Gretchen Houser, Human Resources Manager, was notified by the Human Resources Coordinator at the Lincolnshire, **[*5]** Illinois headquarters of Barilla that Wright had not completed all the necessary paperwork for employment. Houser pulled tax and benefit forms from the HR files in her office. She then went to his office where she presented the forms for Wright to sign. Wright proceeded to sign the forms, which were duplicates of the tax and benefit forms provided in the new hire orientation packet that he had received earlier from Maiorca. Houser also provided Wright with another employee handbook. Wright signed the form confirming receipt of the handbook. While in his office, Houser noticed Wright's new hire orientation packet near his desk. She reminded him there were still forms in the packet that he needed to sign. Wright confirmed that he was aware of that fact. The confidentiality and non-compete agreement was not specifically mentioned at this meeting. At the time he left Barilla, his personnel file contained all of the documents he was required to sign except for the confidentiality and non-compete agreement.

As plant manager, Wright was exposed to a large amount of Barilla's proprietary information. First, Wright went to Italy for detailed training involving Barilla's manufacturing processes. **[*6]** He took photos and kept detailed notes in his personal notebooks while touring the Italian production facilities. Wright saw the highly customized and specialized pasta manufacturing machinery. Barilla showed him the specifications that are consistently used at all of its manufacturing facilities worldwide. Wright also had full access to all information and specifications at the Ames facility. Barilla took great pains to protect its facilities and processes. It limited access to the plant and required all visitors, suppliers, and employees to sign confidentiality agreements. Barilla also made all managers sign non-compete agreements.

In addition to the facilities, Wright had access to all of Barilla's technical information. This access was gained through Angelo Ambrosecchia. Ambrosecchia is an employee of Barilla's parent company. He came to the Ames facility because of his technical expertise and knowledge of pasta. Ambrosecchia is currently working as a production technologist at the Ames plant. He is the link to Barilla's research and development team in Italy. Ambrosecchia is the only Ames employee to have complete access to the technical information.

In February, Wright had **[*7]** an extensive conversation with Ambrosecchia concerning different improvements and measurements that were possible at Barilla. At the conclusion of the conversation, Wright asked for a copy of the information discussed. Ambrosecchia informed Wright that the files were too big to send via email but that he could have the data put onto a CD. The IT Intern was the only Ames employee with the capacity to burn information onto a CD. Therefore, the following week Ambrosecchia had the Intern burn a CD. The disk contained all of the information acquired and compiled over the four years the Ames facility had been operating. It also contained all the trade secrets necessary to build and operate a state-of-the-art Barilla plant while adhering to the Barilla quality guidelines. The CD was basically a library of Barilla's 125 years of data collection, which included general layout details, troubleshooting guidelines, gelatinization and solubilization information, recipes, hydration processes, manufacturing technology, as well as other information. In essence, the CD contained the heart of the pasta factory. The Defendants admit the CD contains trade secrets as defined by Iowa law. Wright notes here, **[*8]** though, that this was more information than he wanted. Ambrosecchia then delivered the CD to Wright who in turn uploaded the information to his office computer. Wright contends that he then returned the disk to Ambrosecchia by placing it on his

chair when Ambrosecchia was away from his desk. Wright also states that the next time he saw Ambrosecchia he asked him if he had received the CD back and Ambrosecchia said, "yes." Ambrosecchia contends that he never received the CD back from Wright.

Wright also received all of Barilla's financial information. Tonya Janes, Manager of Manufacturing Accounting at Barilla, produced and distributed a monthly financial statement for the Ames facility. These statements included all the costs incurred by Barilla to make its product. The statements specifically included, but were not limited to, the following: wheat prices, transformation costs, production volume, ingredient usage, waste recovery, payroll, and utility fees. The statement then compared all of the cost information to the corresponding annual budget figures. During the last three months of Wright's employment, Janes explained and discussed these statements with him.

On Friday, May 24, **[*9]** at about 2:45 p.m., Wright tendered his resignation letter to Houser. The resignation was effective immediately. Wright was to leave the premises within an hour and would begin working for AIPC on the next workday after the Memorial Day weekend. Houser left Wright's office upset and confused, but then came back to discuss the returning of company property. Before she even had to ask, he offered his facility keys, gate access card, and his American Express credit card. Wright assured Houser that everything else belonging to the company was being left in his office. Houser did not witness him leaving the facility that day because she was trying to contact key management personnel, including Wright's immediate supervisor, McGowan, to notify them of the situation. Houser was able to reach McGowan at the airport as he was preparing to leave for a planned vacation.

Wright had held a meeting with his staff at about 2:30 p.m. the day he left to notify them of his departure. Wright responded to questions by stating that he was going to work for a competitor in Arizona, which everyone knew to be AIPC. Wright also told his staff that he had been involved in ongoing discussions concerning the **[*10]** new position since his training trip to Italy in February.

Ambrosecchia was not in the Ames plant that day because he was on vacation in Italy. When he returned to the Ames office on Tuesday, May 28, he notified Gretchen that he had never received the CD he made for Wright back. Houser thoroughly searched Wright's office and did not find the CD from Ambrosecchia. The whereabouts of that CD are still in question. In addition, during Houser's office search the financial statements developed by Janes for 2001 were found, but the January, February, March, and April, 2002 reports were all missing. Wright states that he threw the reports away, but Barilla contends he took them.

Since the first TRO hearing Wright has turned over one of the two personal notebooks in which he took diligent notes. The remaining notebook has not been delivered to the Court or Barilla's counsel. Also, Wright's digital photos of Barilla's Italian operations have not been delivered to the Court or Barilla's counsel. However, the Court has received two CDs from Wright. These CDs were taken by Wright in his briefcase. Defendants admit that these CDs contain trade secret information. However, neither one contains **[*11]** the information Ambrosecchia gave Wright. Instead, the CDs turned over contain the following: St. Louis conversion costs from Borden; Barilla's supply chain 2002 budget review details; Barilla's strategic questions concerning improving line productivity, improving planning, purchasing, co-packing, and improving logistics; wheat mixes; the capital investment summary; extraction rates; inventories; intercompany transfers; as well as other Barilla financial and budget information.

## II. DISCUSSION

The factors to consider in deciding whether to issue a preliminary injunction are as follows: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981)*. Applying these factors to the case at hand, the Court finds that sufficient evidence exists to grant Barilla's motion for a preliminary injunction.

### A. Threat of Irreparable Harm

The Court must first consider whether there is a threat **[*12]** of irreparable harm to Barilla if an injunction is not issued. Courts have recognized that the disclosure of trade secrets to a competitor may cause irreparable harm. *See Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405, 1434-36 (N.D. Iowa 1996)*; *Diversified Fastening Sys. v. Rogge, 786 F. Supp. 1486, 1492-93 (N.D. Iowa 1991)*; *Norand Corp. v. Parkin, 785 F. Supp. 1353, 1355 (N.D. Iowa 1990)* (Hansen, J.). The types of trade secrets at issue in this case are some of Barilla's most closely-guarded financial and technical information. While the question of whether there is a real threat of Wright disclosing those trade secrets to AIPC is subsumed in the Court's analysis of Barilla's likelihood of success on the merits, it suffices to say here that the disclosure of these types of trade secrets would cause irreparable harm to Barilla.

**B. Balance of Harms**

The next factor the Court must consider is the balance of the harm caused to Barilla if an injunction is not issued and the harm that granting the injunction will inflict on Wright and AIPC. As stated above, the harm Barilla faces is the disclosure of some of its most closely-guarded **[*13]** financial and technical information. The disclosure of this information to one of Barilla's two main competitors in what is an undisputably competitive industry would pose serious harm to Barilla. In fact, it seems that the veritable wealth of information that is involved here could surmount the competitive edge Barilla currently maintains over AIPC.

The harm inflicted upon Wright would also be serious. Wright's supervisor at AIPC testified that Wright would be terminated if this injunction is issued. The Court believes that Wright made the move to Arizona for his family. Wright testified that they had lived in Arizona before and that they had always wanted to move back. According to Wright, there are not many food processing jobs in Arizona. Wright also testified that the move to Arizona had something to do with his wife's medical condition. However, a couple of points must be noted about Wright's harm. First, the Court notes that only five of Wright's twenty-six years of food processing experience have been in the pasta business. As a matter of fact, the job Wright gave up to take the job at Barilla was not in the pasta business. The Court therefore finds Wright's harm to be, for **[*14]** the most part, confined to the loss of the AIPC job in Arizona. Second, the Court notes that Wright voluntarily left the job at Barilla--a job that paid about the same as the job at AIPC. Nonetheless, the Court empathizes with Wright's situation and considers his harm in this matter to be very serious.

The harm inflicted upon AIPC would not be as serious. The AIPC representative at the hearing testified that AIPC's Tolleson facility would be up and running by October 2002 with or without Wright. And while it can be assumed that AIPC would rather have Wright than not have him, there was no testimony that Wright's skills were irreplaceable.

This presents the Court with a difficult decision. The Court is very troubled with the prospect of forcing an employee out of his job. However, in addition to the points the Court noted above, two things tip the balance of harms in Barilla's favor. The first thing is the importance of the trade secrets at issue. While Wright may find another job, Barilla can never recoup the loss of their trade secrets. The second thing is the way Wright handled Barilla's trade secrets. Wright was most certainly aware of not only his duty not to disclose confidential **[*15]** information at Barilla, but of the general sensitivity of the information in the Barilla facility. Wright signed a receipt for a handbook that explained his duty not to disclose confidential information. The employee handbook stated the following with respect to confidentiality of information:

> At Barilla, it is our policy to ensure that the operations, activities and business affairs of Barilla and our customers are kept confidential to the greatest possible extent. If, during your employment, you acquire confidential or proprietary information about Barilla and its customers, such information is to be handled in strict confidence and is not to be discussed with anyone outside of the organization. When you leave employment with Barilla, you are required to honor the confidentiality of any confidential or proprietory [sic] information and may not use it for yourself or transmit it to third parties for their use. Employees are also responsible for the internal security of such information.

Wright also at one point inquired of McGowen to make sure that a certain outsider working in the plant had signed a confidentiality agreement. Yet, at a minimum, Wright handled Barilla's **[*16]** trade secrets in a haphazard way. For example, Wright admits that he left with two CDs of Barilla trade secret information. The Court therefore concludes that the balance of harms weighs in Barilla's favor.

**C. Likelihood of Success on the Merits**

The third factor the Court must consider is the likelihood that Barilla will succeed on the merits. Barilla makes two arguments as to why an injunction preventing Wright from working for AIPC or another competitor is appropriate. First, Barilla argues that Wright should be estopped from denying that he is bound by the non-compete agreement it gave him. Second, Barilla argues that an injunction preventing Wright from working for a competitor is proper under the inevitable disclosure doctrine. Also, as part of these arguments, Barilla requests an injunction on the misappropriation and disclosure of its trade secrets.

**1. Estoppel**

Barilla asserts that Wright should be estopped from denying the terms of the standard confidentiality and non-compete agreement because he gave assurances that he would sign the agreement and was silent when he had a duty to speak, which induced Barilla to reasonably rely upon his acceptance of the agreement **[*17]** to its detri-

ment. To prove an claim of estoppel, a party must show: (1) that a person through his acts, representations, assurances, or silence when he has a duty to speak, induced another to believe certain facts were true, and (2) the other party reasonably relied on that belief to their detriment. *Sanborn v. Maryland Casualty Co., 255 Iowa 1319, 125 N.W.2d 758, 763 (Iowa 1964)*. The party asserting the estoppel claim bears the burden of proving and establishing all of the elements through strict proof. *Sioux City v. Johnson, 165 N.W.2d 762, 768 (Iowa 1969)*.

The record does not show that Wright made any kind of representations or assurances that he would sign the confidentiality and non-compete agreement. Instead, the facts show that McGowen, Maiorca, and Houser never discussed a confidentiality and non-compete agreement with Wright. An agreement was not discussed at Wright's interview with McGowen, in the offer letter dated January 8, 2002, or in any other correspondence between the parties before Wright's resignation. Maiorca and Houser did, however, remind Wright that he still needed to review the new hire orientation packet. Both women stated **[*18]** that he had forms to sign within the packet, but did not state that an agreement was enclosed. Also, when Houser physically took employment forms to Wright's office, she did not include an agreement. During that same visit to his office, she reminded him there were still forms in the new hire orientation packet to sign but did not mention the confidentiality and non-compete agreement. Wright confirmed he still had forms to review and sign, but never stated that he either would or would not sign the agreement. Therefore, the Court finds no assurances were given by Wright to Barilla that he would accept and sign the confidentiality and non-compete agreement.

In the alternative, Barilla asserts that Wright had a duty to tell Barilla he would not sign the confidentiality and non-compete agreement. Barilla has not shown, nor does the Court find, that Wright had any duty to speak. *See generally In re Ellison Assoc., 63 B.R. 756, 765 (S.D.N.Y. 1983)* (duty to speak is not only a legal duty but can be based on ethical and good faith principles). While Wright was probably aware of the confidentiality and non-compete agreement in his new hire orientation packet, no Barilla representative **[*19]** ever specifically mentioned it to him. Wright had no duty to tell Barilla he was not going to sign the agreement in such a situation. Rather, the burden should be on the company to either condition the offer of employment on such an agreement or sometime thereafter get him to sign the agreement.

Nor has Barilla demonstrated that it reasonably relied on anything that might be called an acceptance. First, relying on Wright's inaction is not reasonable considering the magnitude of the rights that he was relinquishing. By assuming acceptance, Barilla would be restraining Wright's ability to freely seek employment. This is a severe limitation and it should not be taken lightly. Second, Barilla is aware of the extreme importance of the trade secret information contemplated by the confidentiality and non-compete agreement. It is a corporation that has taken great pains to protect that trade secret information. It controls visitor and vendor access to the plant and has all relevant parties sign confidentiality agreements before accessing the plant. However, the record shows that employees have slipped through the cracks and did not sign the necessary agreements. In fact, Barilla has a semiannual **[*20]** audit procedure to confirm every employee has signed the appropriate documents. Barilla is clearly the more sophisticated party with plans and procedures in place to protect its proprietary information. Considering these two factors, Barilla was not reasonable in its reliance.

Barilla cites *Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405 (N.D. Iowa 1996)*, in support of its estoppel argument. It notes that in that case the district court issued a preliminary injunction barring the plant manager from violating a non-compete agreement even though the plant manager maintained that he had never seen, signed, or knew of any non-compete agreement, and even though no signed non-compete agreement was ever produced. *Uncle B's Bakery, Inc., 920 F. Supp. at 1433*. However, *Uncle B's Bakery, Inc.* is not an estoppel case. There the court based its holding on the finding that the defendant did, in fact, sign a non-compete agreement. *Uncle B's Bakery, Inc., 920 F. Supp. at 1431*. The Court therefore finds Uncle B's irrelevant to this issue.

Barilla has failed to show that Wright made any assurances or representations that he would sign the **[*21]** agreement or that he had any duty to speak. Barilla has also failed to demonstrate that it reasonably relied on anything that might be construed as an acceptance of the confidentiality and non-compete. Therefore, Barilla's likelihood of success on the merits of this claim are unlikely at best.

**2. Inevitable Disclosure/Threatened Disclosure**

Barilla argues that it is entitled to an injunction because Wright would inevitably disclose its trade secrets to AIPC. The Iowa Uniform Trade Secrets Act makes the misappropriation of trade secrets illegal. *Iowa Code § 550.1* (2001). The inevitable disclosure doctrine has been used as a vehicle for showing that an injunction is necessary to prevent the misappropriation of trade secrets. In this case, Barilla's contention is that based on the knowledge of Barilla's trade secrets that Wright acquired while working there and his new duties and incentives with AIPC, it would be inevitable that he would disclose that

information to AIPC and thereby violate the Iowa Uniform Trade Secrets Act.

There has been some disagreement among the courts, however, as to exactly what is the appropriate standard for inevitable disclosure. The seminal case on **[*22]** inevitable disclosure is *Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995)*. In that case, the defendant employee left Pepsico, Inc. for employment with Quaker Oats Company. *Id. at 1264*. Pepsico, Inc. and Quaker Oats Company were in competition in the sport drink and new age drink business. *Id.* The defendant had worked at Pepsico, Inc. for ten years and was in a relatively high-level position when he left. *Id.* The plaintiff was able to show that the defendant had extensive and intimate knowledge about plaintiff's strategic goals for that year. *54 F.3d at 1269*. It argued that this information would be inevitably disclosed not because defendant would try to co-opt the marketing and advertising information, but because he would be able to anticipate plaintiff's distribution, packaging, pricing, and marketing moves. *Id. at 1270*. The court agreed. *Pepsico, Inc., 54 F.3d at 1270*. In so holding, the court also noted that the district court had concluded that the defendant had demonstrated a lack of forthrightness that demonstrated a willingness to misuse plaintiff's trade secrets. *Id. at 1270*. The circuit, while not necessarily **[*23]** agreeing with this finding, held that the district court's conclusion was not an abuse of discretion. *Id. at 1271*.

The court in *Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326 (S.D. Fla. 2001)*, however, rejected the inevitable disclosure doctrine as it understood it because the court found the standard to be too prophylactic. In that case, the defendant employee left his employer of sixteen years, a fruit company, to go work for a competitor fruit company. *Id. at 1328-29*. Over his sixteen years, the defendant was the Director of Research and Development and then later, the Senior Vice President for Research Development and Agricultural Services, which the court notes involved minimal involvement in actual research. *Id. at 1329*. In its analysis, the court stated that while the plaintiffs would likely prevail under the inevitable disclosure doctrine, it would not apply it. *Id. at 1336*. Instead, the court held that the plaintiff had to prove either an actual or threatened disclosure of trade secrets. *Id. at 1337*. It stated that it believed at least that the two doctrines **[*24]** were different, and that it would not enjoin the defendant simply because he possesses some trade secrets and his new employer is a competitor of the plaintiffs. *Id. at 1337-38*.

The court then applied the threatened disclosure doctrine and found that the plaintiff had failed to prove the "inevitability-plus requirement," which it described as "'a substantial threat of impending injury.'" *Del Monte Fresh Produce Co., 148 F. Supp. 2d at 1338-39*. In so finding, the court noted that the plaintiff neither took documents or confidential information with him when he left defendant, nor was there evidence that he made an effort to take such information. *Id. at 1339*. The court also noted that it found credible plaintiff's testimony that he could not remember any trade secret information with precision. *Id.* In addition, the court stated that defendant's new employer was very aware of his obligations not to disclose trade secret information was taking measures to make sure that did not happen. *Id.*

This Court is not convinced that the inevitable disclosure doctrine and the actual or threatened disclosure doctrine standards of proof have **[*25]** to be different. The Iowa Uniform Trade Secrets Act provides that "the owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation." *Iowa Code § 550.3(1)*. Applying the logic of the *Del Monte Fresh Produce Co.* court, then, this Court would be confined to the actual or threatened disclosure doctrine. But an alternative reading of the inevitable disclosure doctrine is that it is just one way of showing a threatened disclosure. For example, in *Pepsico, Inc.,* the court used the terms inevitable disclosure and threatened disclosure interchangeably. Also, the *Pepsico, Inc.* court seemed to go through much of the same analysis as the *Del Monte Fresh Produce Co.* court did but still referred to it as inevitable disclosure whereas the *Del Monte Fresh Produce Co.* court referred to the analysis as threatened disclosure. The inevitable disclosure doctrine and the threatened disclosure doctrine are, however, aimed in different directions. The inevitable disclosure doctrine appears to be aimed at preventing disclosures despite the employee's best intentions, and the threatened disclosure doctrine appears to be aimed at preventing disclosures **[*26]** based on the employee's intentions. The Court agrees with the court that the inevitable disclosure standard needs to be a strict one. However, the approach this Court takes will be to simply enforce a stricter standard on inevitable disclosure, and then treat it and the threatened disclosure doctrine as variations of the same standard.

The evidence that seems to go toward the inevitable disclosure doctrine in this case is the trade secret information that Wright might have held in his head when he left Barilla. McGowen, Wright's supervisor, testified that Wright had an in-depth knowledge of Barilla's cost structure. McGowen also testified that Wright had seen Barilla's wheat contracts, and because AIPC had their own mill he could use that knowledge to challenge the price of wheat as well. However, McGowen himself could not recite the terms of the wheat contracts. In terms of technical knowledge, McGowen testified that Wright had been exposed to how Barilla lays its fans out on its lines, how they develop their dyes and inserts, and their trou-

bleshooting techniques. McGowen also testified that Barilla was in the process of designing a new line while Wright was there and that they were **[*27]** worried that he could use his knowledge of that to alter AIPC's new machines with respect to the drying times and curves. In sum, McGowen testified that Wright had been exposed to how Barilla is so productive and how it makes such a high quality pasta.

Tonya Janes testified that Wright had access to Barilla's financial and budgetary information. She testified that during the course of Wright's time with Barilla, she went over with him three monthly reports that compared all of Barilla's costs to their budget. While she testified that these numbers remain fairly constant, though, she could not recite any of the figures herself.

Wright and AIPC paint a much different picture. Wright testifies that he was brought on to bring the plant together in terms of discipline after a recent failed unionization effort that dropped employee morale, and that his focus was not on the technology side of the business. He testified that while he was exposed to Barilla's cost structure, he did not have a good handle on it because of the bad reporting system it had in place. Because of these things, Wright testified, he did not retain any trade secret information when he left Barilla. David Watson, Executive **[*28]** Vice-President of Operations and Corporate Development at AIPC, testified that he did not know how Wright would be able to utilize anything at AIPC. that he might have learned at Barilla. He testified that Wright would not be responsible for recipes, pricing, marketing, or general corporate direction. He also testified that AIPC's plants were actually more productive than Barilla's Ames plant. Watson did admit, however, that Wright would be responsible for quality standards. Watson also admitted that Wright could earn up to $ 45,000 in bonus pay based on his performance at AIPC.

The mental evidence alone is enough to warrant an injunction. The way this Court interprets the inevitable disclosure doctrine, an employer must prove not only that the employee had access to or knowledge of trade secrets and that the duties of his or her next job overlap with the duties of his or her previous job, but that he or she would be able to remember the trade secret information in a usable form. The rationale behind this interpretation is that employees are being required to give up a substantial right in these cases and a more searching analysis should be required before it is taken away. The court **[*29]** in *Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339 (S.D. Fla. 2001)*, required precision in the knowledge that the employee took with him. Likewise, other courts have given great weight to the reasons why an employee would be able to retain and use the trade secret information at issue. *See Air Products and Chemicals, Inc. v. Johnson, 296 Pa. Super. 405, 442 A.2d 1114, 1123 (Pa. Super. 1982)* (noting that the defendant could appreciate the trade secret knowledge both as an engineer and as a manager); *Emery Indus., Inc. v. Cottier, 1978 U.S. Dist. LEXIS 15953, 202 U.S.P.Q. 829, 834 (S.D. Ohio 1978)* (noting that the defendant had been employed a substantial period of time for the plaintiff company and worked in a specialized area).

In this case, the testimony does not show that Wright retained the trade secret information he was exposed to at Barilla. First, the testimony did show that Wright's focus at Barilla was on the personnel side rather than the technical side. Second, it must be noted that Wright was only at Barilla for four months. Finally, and most importantly, no Barilla representative was able to articulate **[*30]** exactly what trade secret information Wright could have remembered. In sum, while Wright was clearly exposed to trade secret information, Barilla did not connect all the dots from that exposure to what he actually remembered, or should have remembered, to how he could use it at AIPC.

The real strength of Barilla's case, though, is the physical evidence of trade secret information that Wright took with him. There are five items of physical evidence of trade secret information that Wright is alleged to have taken with him when he left Barilla. First, there is the CD that Ambrosecchia made for him. Second, there are the two CD's that had other Barilla trade secret information on them. Third, there are the two notebooks Wright kept while at Barilla. Fourth, there are the photographs that Wright took on a digital camera of the Barilla facilities while he was in Italy. Fifth, there are the missing financial statements. Wright has produced to the Court the two CDs that Ambrosecchia did not make and one of his notebooks. He states that his other notebook is in storage with a lot of other belongings because of his being in the process of moving. He also states that while he does have the pictures **[*31]** from Italy, he has not looked at them yet. Wright says that he returned the CD Ambrosecchia made him back to Ambrosecchia a day or so after he received it and uploaded it onto his computer and that threw away the financial statements as he was cleaning up his office immediately before leaving Barilla.

The case then basically comes down to a determination of Wright's credibility and intent. Several things weigh against Wright's credibility and in favor of a nefarious intent. Most importantly, there is Wright's changed story with respect to the Ambrosecchia CD. In his brief and in court Wright's attorney represented that he still had the actual CD that Ambrosecchia burned for Wright. This story changed, however, when Ambrosecchia put both of the CDs Wright had in court into his computer and showed that neither one was the CD he had made. After Ambrosecchia's testimony, Wright, for

the first time, said that what actually happened was that upon receiving the CD from Ambrosecchia he uploaded onto his computer and then put it on Ambrosecchia's chair. Wright explains that he thought that maybe the two CDs he had in court might have contained the information Ambrossechia gave him. He testified **[*32]** that he had not looked at the CDs since March and was not sure what was on them. However, the Court finds Wright's original assertions that he still had the CD and his current testimony to be irreconcilable.

That leads the Court to the next factor that weighs against Wright's credibility and intent. Wright admits that he left Barilla with two CDs that contained Barilla trade secret information. Wright's only explanation for this is that he forgot they were in his briefcase. The Court finds this troubling to say the least.

The circumstances surrounding the missing financial statements are also troubling. Houser testified that when she searched Wright's office she found that the January, February, March, and April financial statements were missing. Wright testified that he threw them away in an effort to clean up his office on his last day. However, Houser testified that the remaining financial statements were in a drawer and that all of the 2001 statements were still there.

Finally, there a few minor points that weigh on the matter. While searching his office, Houser also found a folder containing financial information from Borden, Wright's last employer. It is unclear whether that **[*33]** folder contained any trade secret information, but it does demonstrate an inclination for taking information from one employer to the next. Also, Wright has yet to turn over his photographs of the Barilla Italy facility and his other notebook--both of which could still be copied before being turned over. Along that same line, the Court was disturbed by Wright's statements in his testimony that he simply could have destroyed the evidence that he has already produced. In addition, Barilla made much of Wright's statements when he began his job at Barilla about wanting to learn from the best. Lastly, the Court notes that AIPC began pursuing him in February and that while it was certainly not enough to create a duty to speak, Wright was probably aware of the confidentiality and non-compete agreement given to him by Barilla.

Based on this evidence, the Court finds that a threat of disclosure does exist. Two items containing trade secret information have still not been located and two items have not yet been produced. And, unfortunately, there are simply too many indications that Wright may use this information to further his position at AIPC. The likelihood of success on the merits of this **[*34]** claim is therefore relatively high.

**D. Public Interest**

Finally, the Court must consider the public interest that is at stake. The public interest in protecting valuable trade secrets is "embodied and articulated in the Iowa legislature's passage of the Iowa Trade Secrets Act." *Uncle B's Bakery, Inc. v. O'Rourke, 920 F. Supp. 1405, 1438 (N.D. Iowa 1996)*; *see also Norand Corp., 785 F. Supp. at 1356* ("The public policy of many states, including Iowa, is to prevent the unauthorized disclosure of trade secrets."). The Court therefore finds that the public interest is served by enjoining the disclosure of trade secrets.

**III. CONCLUSION**

The Court therefore concludes that Barilla is entitled to a remedy. Barilla requests that the Court enjoin Wright from being employed by a competitor, including AIPC, and AIPC from employing Wright for at least one year. Barilla also requests that the Court enjoin Wright from misappropriating, and AIPC from utilizing, any of Barilla's confidential, proprietary, or trade secret information. In addition, Barilla requests that the Court enjoin Wright from retaining or in any way utilizing, copying, or disseminating **[*35]** the CDs, written notes, and other writings or recordings that Wright made of Barilla's trade secrets. Finally, Barilla requests that the Court enjoin Wright from soliciting any of Barilla's employees to leave their employment with Barilla and AIPC from soliciting any other Barilla employees to work for it or to provide it with any of Barilla's trade secrets. Barilla requests that all of this injunctive relief be issued without a bond.

The Court will grant in part and deny in part Barilla's request for a remedy. The Court agrees that Wright and AIPC need to be enjoined for a period of one year from misappropriating Barilla trade secret information and from entering into an employment relationship with each other, or from Wright entering into an employment relationship with a competitor. While Court acknowledges that no period of time will allow Wright to forget trade secret information that he has physical evidence of, the testimony showed that an injunction of one year will prevent Wright from taking the plant director job with AIPC. The Court will also craft the injunction broadly, enjoining Wright from taking any position in the pasta industry, so as to prevent any incentive, financial **[*36]** or otherwise, to disclose trade secret information. In addition, the Court agrees that Wright should be enjoined from copying, or in any other way retaining, Barilla trade secret information. The Court hereby puts Wright on notice that if he does not immediately conduct a thorough search and turn over any Barilla trade secret information he still has, he will be the subject of criminal contempt proceedings. But the Court heard no evidence sup-

porting the need for an injunction enjoining AIPC or Wright from soliciting Barilla employees to leave Barilla or to misappropriate Barilla trade secret information. Nor has Barilla offered any support for why this injunction should be issued without a bond. On the other hand, Defendants make no argument on the amount of the bond. A bond will therefore be required in an amount equivalent to Wright's base salary at Barilla. *See Fed. R. Civ. P. 65(c)*.

The following is thereby ordered:

1. Wright is restrained and enjoined from:

a. Being employed by AIPC, or any other competitor of Barilla, until May 24, 2003;

b. Misappropriating Barilla's trade secrets; and

c. Retaining or in any way utilizing, copying, or disseminating [*37] the CDs, written notes, and other writings or records that Wright made of Barilla's trade secrets.

2. Wright must also conduct an immediate and thorough search for anything that he still possesses that may contain Barilla trade secret information and immediately return that material to Barilla. This includes Wright's other notebook, his pictures of the Barilla facilities in Italy, the CD he obtained from Angelo Ambrosecchia, and any Barilla monthly financial statements. A violation of this order will be the subject of criminal contempt proceedings.

3. AIPC is restrained and enjoined from:

a. Employing Wright before May 24, 2003; and

b. Misappropriating any Barilla trade secret information it learned from Wright.

4. Barilla must file a bond within two weeks of this order for an additional $ 52,000. With its previous bond of $ 75,000, this will amount to a total sum of $ 127,000.

IT IS SO ORDERED.

Dated this 5th day of July, 2002.

ROBERT W. PRATT

U.S. DISTRICT JUDGE